UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUILDING INDUSTRY ASSOCIATION – BAY AREA,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF OAKLAND,<br><br>    Defendant. | Case No. 15-cv-03392-VC<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 62 |

The City of Oakland's motion to dismiss is granted. Dismissal is with prejudice.

**I.**

Oakland is one of at least twelve cities in California that have ordinances requiring developers to display or fund art as a condition of project approval. Under the current version of Oakland's ordinance, which was enacted in July 2017, a developer of a multifamily project with over twenty units must either: (i) spend 0.5 percent of building development costs on art displays on the site of the development or a nearby right-of-way; or (ii) pay an equivalent amount to a city-operated fund for public art installations. A developer of certain commercial projects must purchase and install art valued at one percent of building development costs or pay an equivalent fee to Oakland's public-art fund. This requirement applies generally to all development projects that fit the Ordinance's criteria, although there are ways for some developers to get out of the requirement or reduce the amount they need to spend. For example, a developer of affordable housing doesn't need to comply with the ordinance if it can show that compliance costs would make the project economically infeasible. And the ordinance includes a mechanism to

administratively appeal a decision by the Planning Commission or Planning Director requiring compliance with the ordinance.

The Building Industry Association – Bay Area has challenged the validity of the ordinance on two constitutional grounds. First, the Association claims the ordinance violates the Takings Clause of the Fifth Amendment. Second, the Association claims the ordinance compels speech in violation of the First Amendment.

## II.

With respect to the takings claim, the Association argues that the ordinance is an unlawful exaction that violates the "exactions doctrine" applied in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Koontz v. St. Johns River Water Management District*, 133 S. Ct. 2586 (2013). But the Supreme Court has only applied this exactions doctrine in cases involving a particular individual property, where government officials exercised their discretion to require something of the property owner in exchange for approval of a project. And the Court has consistently spoken of the doctrine in terms suggesting it was intended to apply only to discretionary decisions regarding individual properties. *See*, *e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 546-47 (2005). Moreover, the Ninth Circuit and the California Supreme Court have expressly stated that a development condition need only meet the requirements of *Nollan* and *Dolan* if that condition is imposed as an "individual, adjudicative decision." *McClung v. City of Sumner*, 548 F.3d 1219, 1227 (9th Cir. 2008); *Ehrlich v. City of Culver City*, 12 Cal. 4th 854, 876-81 (1996); *id.* at 899-900 (Mosk, J., concurring) ("[W]hen the fee is ad hoc, enacted at the time the development application was approved, there is a greater likelihood that it is motivated by the desire to extract the maximum revenue from the property owner seeking the development permit, rather than on a legislative policy of mitigating the public impacts of development or of otherwise reasonably distributing the burdens of achieving legitimate government objectives."). Broadly applicable regulations like the one at issue in this case are assessed under the *Penn Central* regulatory takings framework. *McClung*, 548 F.3d at 1227.

The Association relies heavily on *Levin v. City and County of San Francisco*, in which Judge Breyer applied the exactions doctrine in a facial challenge to a generally applicable, well-drafted ordinance that required property owners in San Francisco wishing to withdraw their properties from the rental market to make significant payments to the tenants they were evicting, to mitigate the harm those tenants would suffer from being displaced from their homes in an age of skyrocketing rental prices. Although the Ninth Circuit held in *McClung* that *Nollan* and *Dolan* do not apply to generally applicable development conditions, Judge Breyer concluded that this holding was invalidated by the Supreme Court's subsequent ruling in *Koontz*. 71 F. Supp. 3d 1072, 1083 n. 4 (N.D. Cal. 2014).

But that's not what happened in *Koontz*. The Court did not hold in *Koontz* that generally applicable land-use regulations are subject to facial challenge under the exactions doctrine; it held only that the exactions doctrine applies to demands for money (not merely demands for encroachments on property). In reaching this holding, the Court went out of its way to make clear that it was not expanding the doctrine beyond that. *See* 133 S. Ct. at 2602 ("This case does not require us to say more."); *id.* at 2600 n. 2 ("[T]his case does not implicate the question whether monetary exactions must be tied to a particular parcel of land in order to constitute a taking."). *Koontz* involved an adjudication by local land-use officials regarding an individual piece of property, and throughout its decision the Court spoke of the exactions doctrine in those terms. For example, the Court stated: "The fulcrum this case turns on is the direct link between the government's demand and a *specific parcel* of real property." 133 S. Ct. at 2600 (emphasis added). "Because of that direct link," the Court stated, "this case implicates the central concern of *Nollan* and *Dolan*: the risk that the government may use its substantial power and *discretion* in land-use permitting to pursue governmental ends that lack an essential nexus and rough proportionality to the effects of the proposed new use of the *specific* property at issue, thereby diminishing without justification the value of the property." *Id.* (emphasis added); *see also id.* at 2594 (noting that permit applicants are "especially vulnerable" to government coercion "because the government often has broad discretion to deny a permit that is worth far more than property it

3

would like to take"). The exactions doctrine, in other words, has historically been understood as a means to protect against abuse of discretion by land-use officials with respect to an individual parcels of land, and *Koontz* itself spoke of it in those terms, undermining Judge Breyer's argument that *Koontz* displaced the Ninth Circuit's rule that the exactions doctrine is unavailable to a plaintiff making a facial challenge to a generally applicable land-use regulation.

Perhaps reasonable arguments could be made for expanding the reach of the exactions doctrine so that it can be invoked in facial challenges to a generally applicable regulations, rather than merely discretionary decisions regarding an individual property by land-use officials. *See Calif. Building Industry Association v. City of San Jose*, 136 S. Ct. 928, 928-29 (2016) (Thomas, J., concurring in cert. denial). But the point, for purposes of this motion, is that it would be an expansion of the doctrine. If that occurs, it should be in the Supreme Court, not the Northern District of California.

Since the ordinance applies generally to a broad swath of nonresidential and multifamily developments, whether the ordinance facially violates the Takings Clause should be evaluated under the regulatory takings framework. But the Association has not (and cannot) plead a viable facial regulatory takings challenge to the ordinance, because – at a minimum – the fee required by the ordinance is no more than one percent of building development costs. *See Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978). This cost, which is only triggered if a developer chooses to build certain types of nonresidential and multifamily construction, does not cause a large enough loss of value to amount to a facial regulatory taking. *See Keystone Bituminous Coal Association v. DeBenedictis*, 480 U.S. 470, 495 (1987); *Penn Central*, 438 U.S. at 124-26.

## III.

The Association claims that the ordinance violates the First Amendment rights of its members because the ordinance requires developers to engage in speech.

It would be difficult to accept Oakland's argument that the ordinance does not implicate the First Amendment at all. The purchase and display of artwork is a protected form of

expression.  *See White v. City of Sparks*, 500 F.3d 953, 955-57 (9th Cir. 2007); *cf. Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569 (1995).  And the ordinance requires developers to pay for art (and display it, unless they comply by paying the fee to fund the City's art program).

But it's even tougher to accept the Association's argument that the ordinance is automatically invalid simply because it involves some degree of compelled speech.  Plenty of laws involve a degree of compelled speech, and only some of those trigger heightened judicial scrutiny.  *Cf. Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1152 (2017) (Breyer, J., concurring in judgment) (noting that "virtually all government regulation affects speech").

When determining whether to apply heightened scrutiny, courts should assess "whether, or how, a challenged statute, rule, or regulation affects an interest that the First Amendment protects." *Id.*; *see also* Vikram David Amar & Alan E. Brownstein, *How First Amendment Speech Doctrine Ought to Be Created and Applied in the Colorado Baker/Gay Wedding Dispute at the Supreme Court*, Verdict (Sept. 22, 2017) [https://perma.cc/3QL6-GNRF] (discussing characteristics of compelled speech requirements that trigger heightened judicial scrutiny).  For example, the Court has closely scrutinized laws that compel people to convey a political or ideological message or affirm a specific belief because these laws interfere with open discourse and disrupt speakers' ability to freely express their own ideas.  *See, e.g.*, *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205, 218 (2013); *Wooley v. Maynard*, 430 U.S. 705, 714-16 (1977); *W. Va. State Board of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  The Court has also applied heightened First Amendment scrutiny where a law requires certain speakers to publish others' messages, if the requirement hinders the speakers' ability to express their own message.  *See Pacific Gas & Elec. Co. v. Public Utilities Comm'n*, 475 U.S. 1, 13-14 (1986); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  On the other hand, if the speech requirement is minimal, if there is minimal risk that the speech could be misattributed, and if the speech requirement doesn't significantly deter other speech, judicial scrutiny is far more relaxed.  *See Rumsfeld v. Forum for Academic and Institutional*

*Rights, Inc.*, 547 U.S. 47, 65, 69 (2006); *PruneYard Shopping Center. v. Robins*, 447 U.S. 74, 87 (1980); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).

Oakland's ordinance does not raise any of the red flags discussed above or otherwise "significantly affect the interests that the First Amendment protects." *Expressions Hair Design*, 137 S. Ct. at 1152 (Breyer, J., concurring in judgment). The ordinance does not require a developer to express any specific viewpoint, because developers can purchase and display art that they choose. To the extent a developer wishes for the building to convey a particular message, there's no reason to believe that an art display would muddle that message. (And in at least some cases, a developer can comply with the ordinance without modifying the building's design at all by placing the art in a nearby right-of-way.) Perhaps most importantly, even if the ordinance to some extent encourages developers to engage in expressive conduct by purchasing and displaying art, the degree of compulsion is minimal, because if developers do not want to purchase and display art on or near their property, they can comply with the ordinance by paying a fee to the City in the same amount. And although Oakland uses that money to fund art, the Association does not argue (and could not reasonably argue) that the First Amendment prevents a local government from earmarking revenue collected from its residents to display art.

Therefore, the ordinance is subject to review under the First Amendment only to ensure that it is reasonably related to a legitimate governmental purpose. *See Expressions Hair Design*, 137 S. Ct. at 1152 (Breyer, J., concurring in judgment); *cf. Zauderer*, 471 U.S. at 651; *Beeman v. Anthem Prescription Mgmt., LLC*, 58 Cal. 4th 329, 363-64 (2013). The City has articulated a number of legitimate goals; these include improving the aesthetics within the city and bolstering real property values. Oakland, Cal., Ordinance 13443 (June 15, 2017); *see Berman v. Parker*, 348 U.S. 26, 33 (1954); *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 388-89 (1926). It is reasonable to believe that the installation of art at or around new developments and the installation of public art funded by the in lieu fee will both improve the city's aesthetics and increase property values. It is also reasonable to assume that development can have adverse effects on aesthetics in a city (for example, obstruction of views and reduction in sunlight), and

that the art requirement mitigates those adverse effects. Therefore, the ordinance does not violate the First Amendment.

**IT IS SO ORDERED.**

Dated: February 5, 2018

VINCE CHHABRIA
United States District Judge